

**HATTIS & LUKACS**
**Attorneys at Law**

**California Office**
936 Woodlawn Drive
Thousand Oaks, CA 91360
Phone: 805.233.8062
www.hattislaw.com

Washington State Office
400 108th Ave NE, Ste 500
Bellevue, WA 98004

Paul Karl Lukacs, Esq.
805.233.8062
pkl@hattislaw.com

July 12, 2023

**<u>VIA ECF</u>**

Ms. Molly C. Dwyer
Clerk of the Court
U.S. Court of Appeals for the Ninth Circuit
James R. Browning Courthouse
95 Seventh Street
San Francisco, CA 94103-1526

   Re: **Notice of Answer To Certified Question**
      *Susan Clark v. Eddie Bauer LLC*
      Case No. 21-35334

Dear Ms. Dwyer:

   Pursuant to the Court's Order Certifying Question To The Oregon Supreme Court (Dkt. No. 43), Plaintiff and Appellant Susan Clark hereby notifies the Clerk of the Court that the Oregon Supreme Court has answered the certified question. The Oregon Supreme Court's decision is attached.

        Very truly yours,

        Paul Karl Lukacs, Esq.
        Counsel for Plaintiff and Appellant Susan Clark

Enclosure

cc: Counsel for Appellees (w/ enc.)

IN THE SUPREME COURT OF THE STATE OF OREGON

Filed: June 29, 2023

SUSAN CLARK, for herself and/or on
behalf of all others similarly situated,

Appellant,

v.

EDDIE BAUER LLC and EDDIE BAUER
PARENT, LLC

Appellees.

(United States Court of Appeals for the Ninth Circuit No. 2135334) (SC S069438)

On certified question from the United States Court of Appeals for the Ninth Circuit; certified order dated April 14, 2022, certification accepted May 19, 2022.

Argued and submitted November 29, 2022.

Che Corrington, Hattis & Lukacs, Bellevue, Washington, argued the cause and filed the briefs for appellant.

Michael Vatis, Steptoe & Johnson LLP, New York, New York, argued the cause and filed the brief for appellees. Also on the brief was Sara Kobak, Schwabe, Williamson & Wyatt, PC, Portland.

Christopher A. Perdue, Assistant Attorney General, Salem, filed the brief for *amicus curiae* Oregon Department of Justice. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Chris Mertens, Mertens Law LLC, Portland, filed the brief for *amicus curiae* Oregon Consumer Justice. Also on the brief was Kelly Jones, The Law Office of Kelly D. Jones, Portland.

Nadia H. Dahab, Sugerman Dahab, Portland, filed the brief for *amicus curiae* Oregon Trial Lawyers Association.

Anna-Rose Mathieson, Complex Appellate Litigation Group LLP, San Francisco, California, filed the brief for *amici curiae* Chamber of Commerce of the United States of America, National Retail Federation, Retail Litigation Center, and Oregon Business & Industry Association.

Before Flynn, Chief Justice, and Duncan, Garrett, DeHoog, and Bushong, Justices, and Balmer and Walters, Senior Judges, Justices pro tempore.*

DeHOOG, J.

The certified question is answered.

*Nelson, J., resigned February 25, 2023, and did not participate in the decision of this case.  James, J., did not participate in the consideration or decision of this case.

---

### DESIGNATION OF PREVAILING PARTY AND AWARD OF COSTS

Prevailing party:  None.
[X]    No costs allowed.
[  ]    Costs allowed, payable by:
[  ]    Costs allowed, to abide the outcome on remand, payable to:

1    DeHOOG, J.

2    Under Oregon's Unlawful Trade Practices Act (UTPA), ORS 646.605 to

3    646.656, a person who suffers an "ascertainable loss of money or property" as a result of

4    another person's violation of the UTPA may maintain a private action against that person.

5    ORS 646.638(1).  This case, which comes before us on a certified question of Oregon law

6    from the United States Court of Appeals for the Ninth Circuit, requires us to determine

7    whether a consumer can suffer an "ascertainable loss" under the UTPA based on a

8    retailer's misrepresentation about price history or comparative prices.  More specifically,

9    we must consider whether a consumer suffers a cognizable "ascertainable loss" under

10   ORS 646.638(1) when she buys items at an outlet store that have been advertised as being

11   sold at a substantial discount but that have never been sold at that or any other location at

12   the "list," or non-sale price.  The Ninth Circuit's certified question, which we have

13   accepted, is as follows:

14       "Does a consumer suffer an 'ascertainable loss' under [ORS] 646.638(1)
15       when the consumer purchased a product that the consumer would not have
16       purchased at the price that the consumer paid but for a violation of [ORS]
17       646.608(1)(e), (i), (j), (ee), or (u), if the violation arises from a
18       representation about the product's price, comparative price, or price history,
19       but not about the character or quality of the product itself?"

20   For the reasons that follow, our answer to that question is yes.

21                                    I.  BACKGROUND

22   We take the facts from the Ninth Circuit's certification order.  *Clark v.*

23   *Eddie Bauer LLC*, 30 F4th 1151 (9th Cir 2022) (*Clark II*).  Defendants Eddie Bauer LLC

24   and Eddie Bauer Parent, LLC, operate the Eddie Bauer Outlet chain of stores, where they

1

1    sell branded clothing.[1]  More than 90 percent of the products offered at the outlet stores

2    are manufactured solely for sale at the outlet stores and are not sold elsewhere.

3    Defendants advertise clothing at the Eddie Bauer Outlet stores as being sold at a

4    substantial discount, typically between 40 percent and 70 percent off.  However, with

5    limited exceptions, the clothing is never sold -- at the outlet stores or anywhere else -- at

6    the "list" price, *i.e.*, the price shown on each product's original tag; the clothing sold at the

7    outlet stores is only ever sold at "discounted" prices.  *Id*. at 1153.

8            In 2017, plaintiff purchased two articles of clothing from one of defendants'

9    outlet stores in Oregon.  She purchased a "Fleece Zip," which had an attached tag

10    indicating an original price of $39.99, but whose accompanying signage advertised the

11    garment as being sold at 50 percent off, resulting in a "sale" price of $19.99.  Plaintiff

12    also purchased a "Microlight Jacket" with a tag price of $99.99.  The signage for that

13    jacket indicated that it was on sale for $49.99.  For both items, plaintiff paid the "sale"

14    price.  In 2018, plaintiff returned the Microlight Jacket and received a $49.99 credit,

15    which she applied toward the purchase of a "StormDown Jacket."  The product tag for

16    that jacket showed a list price of $229.00.  However, a sticker on the tag showed a

17    reduced price of $199.99, and adjacent signage noted an additional 50 percent discount,

18    resulting in an end "sale" price of $99.99, the amount that plaintiff paid.  *Id*.

---

[1]    Defendants also operate non-outlet retail stores and sell clothing through their website, but plaintiff's claim before the Ninth Circuit solely concerns sales at the Eddie Bauer Outlet stores.

1    Plaintiff subsequently filed a complaint in federal district court, alleging

2    that defendants had violated multiple provisions of the UTPA, including, among others,

3    ORS 646.608(1)(j) (making false or misleading representations of fact concerning the

4    reasons for, existence of, or amounts of price reductions), and ORS 646.608(1)(ee)

5    (advertising price comparisons without conspicuously identifying the origin of the price

6    the seller is comparing to the current price).[2]  In addition to the above facts, which are

7    undisputed for purposes of our consideration, plaintiff alleged that she would not have

8    made any of the three purchases if she had known that the goods were not, in fact, being

9    sold at a discount.  That is, plaintiff alleged that she had been fraudulently induced to buy

10   those garments by defendants' false representation that she was buying them at a bargain

11   price.  In her complaint, plaintiff sought actual or statutory damages, punitive damages,

12   equitable relief in the form of disgorgement or restitution, and a permanent injunction

13   prohibiting defendants from engaging in further conduct in violation of the UTPA.[3]

14   Defendants moved to dismiss plaintiff's complaint on the ground that it

15   failed to allege an "ascertainable loss of money or property," as required of a complainant

---

[2]    Plaintiff also alleged that defendants violated ORS 646.608(1)(e) (by representing that the goods had characteristics or qualities that they do not have), ORS 646.608(1)(i) (by advertising goods with intent not to provide them), and ORS 646.608(1)(u) (by engaging in other unfair or deceptive conduct in trade or commerce).

[3]    Plaintiff also sought to certify a class of similarly situated Oregon consumers.  We have not been asked, and do not decide, whether any of plaintiff's theories of loss and related claims were susceptible to treatment on a classwide basis.

1   pursuing a private right of action under the UTPA.  ORS 646.638(1).  Defendants argued

2   that plaintiff had received exactly the products that she believed she was buying, and that

3   their value at the time of sale was at least what plaintiff had paid.  They noted that

4   plaintiff had not alleged, for example, that the Fleece Zip was worth less than the $19.99

5   sale price or that it did not possess the features or quality that plaintiff had expected it to

6   have.[4]  Defendants argued that, to establish an ascertainable loss under the UTPA,

7   plaintiff was required to show that the value or character of the goods that she bought was

8   different than that of the goods that she thought that she was buying.  Defendants

9   contended that a person cannot establish an ascertainable loss by simply proving the

10  person's "subjective disappointment" upon learning that a purchase was not the bargain it

11  had been made out to be.

12          The district court granted defendants' motion to dismiss.  The court held

13  that the complaint failed to state a claim under the UTPA, because it did not allege that

14  defendants had made false representations about the character or quality of the garments

15  that plaintiff bought, which the district court understood to be essential under this court's

16  decision in *Pearson v. Philip Morris, Inc*., 358 Or 88, 122, 361 P3d 3 (2015).  Echoing

17  language found in ORS 646.608(1)(e), one of the provisions that plaintiff had relied on,

---

[4]     Plaintiff did allege that she believed that the price of $39.99 listed on the
product tag attached to the Fleece Zip was its "regular and usual price" and that it
therefore was "worth and had a value of $39.99."  Although plaintiff does not define
"worth" or "value" in her complaint or briefing, we take from that context that "value"
means retail or fair market value.

1 the district court held:

2 "Some misstatement as to a characteristic, quality, or feature of the product
3 is required. [Plaintiff's] complaint provides no such allegation. As a result,
4 the Court must find that she did not adequately plead an ascertainable loss."

5 *Clark v. Eddie Bauer LLC*, No. C20-1106-JCC, 2021 WL 1222521 at *6 (WD Wash, Apr

6 1, 2021) (*Clark I*).[5]

7 Plaintiff appealed the district court's ruling to the Ninth Circuit, arguing that

8 the district court had erred in concluding that the complaint did not adequately allege

9 ascertainable loss. Plaintiff argued that defendants' (and the district court's) view as to

10 what constitutes an ascertainable loss under the UTPA is too limited, noting that many of

11 the provisions of ORS 646.608, including ones she had relied on, prohibit deception in

12 ways that do not relate to the quality or characteristics of a product. She offered what she

13 contended were three viable ways of establishing the required ascertainable loss. First,

14 plaintiff argued that she had suffered an ascertainable loss by purchasing products that

15 she would not have purchased but for the misrepresentations, a theory that plaintiff

16 referred to as the "purchase price" theory, which, she contended, found support in

17 *Pearson*. Second, plaintiff argued that she could establish a loss under an "advantageous

18 bargain" theory because the garments that she had purchased had been worth less than

---

[5] The district court also made other rulings adverse to plaintiff, which plaintiff challenges on appeal in federal court. However, the Ninth Circuit's certified question did not put those rulings at issue in this proceeding, and we therefore do not discuss them.

1    defendants' pricing scheme had deceptively led her to believe.  Under that theory, which,

2    according to plaintiff, the Court of Appeals had recognized in *Simonsen v. Sandy River*

3    *Auto, LLC*, 290 Or App 80, 413 P3d 982 (2018), her loss would be measured by the

4    differences between the "list," or non-sale price of each item and the amounts that she

5    ultimately paid.  Finally, plaintiff argued as a third theory that defendants' false

6    advertising artificially inflated consumer demand, which enabled defendants to charge

7    higher prices for their products across the board.  Plaintiff referred to that theory as the

8    "premium price" theory.

9            Upon reviewing the parties' arguments, the Ninth Circuit noted that, unlike

10   the district court, it was not persuaded that this court's decision in *Pearson* required it to

11   reject plaintiff's various theories of loss.  *Clark II*, 30 F4th at 1156.  However, it also did

12   not understand any of the Oregon cases cited by the parties to resolve the question before

13   it.  *Id*.  Accordingly, the Ninth Circuit invited this court to weigh in on that issue and to

14   answer the question whether a consumer can suffer an "ascertainable loss of money or

15   property" within the meaning of ORS 646.638(1) based on a retailer's misrepresentation

16   about price history or comparative prices.  *Id*. at 1157.[6]

17                                        II.  ANALYSIS

---

[6]      The Ninth Circuit acknowledged that it had only discussed plaintiff's "purchase price" theory at length, but it invited this court to weigh in on whether any of plaintiff's theories of loss were cognizable under the UTPA.  *Clark II*, 30 F4th at 1157. As we explain below, we respectfully decline that broader invitation and, instead, likewise focus our consideration on the viability of the purchase price theory.

1    A.    *Background of the UTPA*

2            The Oregon legislature first enacted consumer-protection legislation in

3    1965.  Or Laws 1965, ch 490, §§ 3-4.  Those early statutes targeted a narrow list of unfair

4    business practices and permitted only district attorneys to enforce their prohibitions.

5    Over the next few years, those statutes came to be seen as "weak and ineffective," in part

6    because they did not authorize lawsuits "by the defrauded consumer himself, either

7    individually or as a member of a victimized class."  Ralph James Mooney, *The Attorney*

8    *General as Counsel for the Consumer: The Oregon Experience*, 54 Or L Rev 117, 119

9    (1975).  Oregon's Attorney General at the time, Lee Johnson, testified at a hearing before

10   the legislature that those first consumer-protection statutes failed to provide robust

11   enforcement provisions:

12           "The most serious defect with the present law is the lack of adequate
13           enforcement provisions both from the standpoint of legal remedies and an
14           appropriate enforcing agency.  Under the present law, enforcement is the
15           exclusive responsibility of the district attorney. * * * The committee also
16           concluded that private individuals who are aggrieved by the deceptive trade
17           practice should have some way of attaining restitution."

18   Exhibit 1, House Committee on Judiciary, HB 1088, Feb 10, 1971 ("Consumer Protection

19   Act Proposal").

20           The legislature responded to those concerns by enacting the UTPA, which

21   vastly expanded the range of prohibited conduct[7] and authorized private plaintiffs to seek

---

[7]    Today, under the UTPA, more than 79 trade practices are identified and
declared unlawful.  ORS 646.608(1)(a) - (aaaa).  Those include, as relevant here, making
false or misleading representations of fact concerning the reasons for, existence of, or

7

1   actual or statutory damages if they suffered an "ascertainable loss of money or property"

2   as a result of any trade practice that the UTPA deemed unlawful.[8]  Or Laws 1971, ch 744,

3   § 13, *codified at* ORS 646.638(1).  As this court explained in *Weigel v. Ron Tonkin*

4   *Chevrolet Co.*, 298 Or 127, 134, 690 P2d 488 (1984), the legislature created a private

5   right of action in the UTPA to "encourage private enforcement of the prescribed

6   standards of trade and commerce in aid of the act's public policies as much as to provide

7   relief to the injured party."

8         For purposes of the certified question, it is undisputed that defendants'

9   conduct in pricing its goods as alleged in the complaint violated certain provisions of the

10   UTPA.  The certified question, however, raises the preliminary issue of what constitutes

11   an "ascertainable loss."  We turn to that issue.

12         The UTPA does not expressly define "ascertainable loss."  We therefore

13   construe that term using the methodology set out in *State v. Gaines*, 346 Or 160, 171-72,

14   206 P3d 1042 (2009).  As we stated in *Gaines*, our "paramount goal" is to ascertain the

15   intent of the legislature.  *Id*. at 171.  To do so, we consider the statutory text and context,

---

amounts of price reductions, ORS 646.608(1)(j), and including a price comparison in an advertisement unless the seller conspicuously identifies the origin of the price the seller is comparing to the current price, 646.608(1)(ee).

    [8]    ORS 646.632 provides for enforcement actions in the public interest by the state.  Unlike private claims brought under the ORS 646.638(1), state enforcement actions do not require proof that any consumer has suffered economic loss or other injury as a result of an unlawful trade practice.  *Pearson*, 358 Or at 116.

1  along with any relevant and helpful legislative history.  *Id*. at 172.  Because the words of

2  a statute are the best evidence of the legislature's intent, we give "primary weight to the

3  [statute's] text and context."  *State ex rel Rosenblum v. Nisley,* 367 Or 78, 83, 473 P3d 46

4  (2020).  In considering that statutory text, we give words of common usage their ordinary

5  meaning.  *Gaines*, 346 Or at 175.  To the extent that a statute includes legal terms of art,

6  we "seek to understand their established legal meanings."  *State v. Iseli*, 366 Or 151, 163,

7  458 P3d 653 (2020).  Context for statutory terms includes, among other things, the

8  historical context of the statute at issue, as well as statutes related to it.  *State v.*

9  *Clemente-Perez*, 357 Or 745, 766, 359 P3d 232 (2015).

10            In addition, when, as here, a statutory term was adopted from a model act,

11  this court "assume[s] that the legislature contemplated that that term would reflect its

12  national understanding" under the model act at the time the model act was adopted in

13  Oregon.  *Wright v. Turner*, 354 Or 815, 825, 322 P3d 476 (2014).  Thus, in interpreting a

14  term from a model act, we also consider the persuasive value of "judicial interpretations

15  of that term that would have been available to the legislature" at the time of adoption.  *Id*.

16  (citing *State ex rel Western Seed v. Campbell*, 250 Or 262, 270-71, 442 P2d 215 (1968),

17  *cert den*, 393 US 1093 (1969) ("When one state borrows a statute from another state, the

18  interpretation of the borrowed statute by the courts of the earlier enacting state ordinarily

19  is persuasive.")).

20            Although this court has not previously addressed the specific issue framed

21  by the Ninth Circuit, we have interpreted the term "ascertainable loss" to mean, generally,

22  "any determinable loss," even a loss that cannot be measured exactly.  *Weigel*, 298 Or at

9

1   137. In *Pearson*, the court stated that an "ascertainable loss" is one that is "capable of

2 being discovered, observed, or established," and "objectively verifiable, much as

3 economic damages in civil actions must be." 358 Or at 117. The court further made

4 clear in *Pearson* that, in private actions under the UTPA, only *economic* losses may be

5 recovered; "noneconomic losses cognizable in a civil action -- such as physical pain,

6 emotional distress, or humiliation * * * will not satisfy a private UTPA plaintiff's

7 burden." *Id*. Notably, however, the court in *Weigel* explained that "[t]he private loss

8 indeed may be so small that the common law likely would reject it as grounds for relief,

9 yet it will support an action under the statute." 298 Or at 136.

10       Furthermore, we have explained that it is appropriate to take a broad view

11 of what constitutes an ascertainable loss: "[I]n enacting ORS 646.638, the legislature was

12 concerned as much with devising sanctions for the prescribed standards of trade and

13 commerce as with remedying private losses, and * * * such losses therefore should be

14 viewed broadly." *Weigel*, 298 Or at 135-36. That broad reading of ORS 646.638(1) is

15 consistent with the legislature's intent that courts interpret the UTPA liberally to protect

16 consumers. *See, e.g*., *Denson v. Ron Tonkin Gran Turismo, Inc.*, 279 Or 85, 90 n 4, 566

17 P2d 1177 (1977) (noting that "the legislative history of the Oregon Unlawful Trade

18 Practices Act supports the view that it is to be interpreted liberally as a protection to

19 consumers"). As one stakeholder explained to the legislature in 1971, "[t]he fundamental

20 philosophy" of the [UTPA's] drafting committee was that none of the prohibited acts had

21 sufficient social value to be allowed to continue and that the function of the law should be

22 to "protect society," including protecting "gullible people from themselves." Tape

10

1   Recording, House Committee on Judiciary, HB 1088, Feb 10, 1971, Tape 5, Side 1

2   (statement of Charles Merten).

3   B.      *Acceptance of the Certified Question*

4                   Returning to the certified question, the Ninth Circuit has asked whether

5   plaintiff can show that she suffered an ascertainable loss as a result of defendant's

6   violation of the UTPA "if the violation arises from a representation about the product's

7   price, comparative price, or price history, but not about the character or quality of the

8   product itself."[9]  We observe two things about that question.  First, in referring to

9   circumstances in which a consumer has "purchased a product that the consumer would

10  not have purchased at the price that the consumer paid," the question appears to reference

11  our discussion of the "purchase price" theory in *Pearson*, which both the Ninth Circuit

12  and the federal district court addressed in their own opinions.  Second, because the Ninth

13  Circuit distinguished cases such as plaintiff's -- involving allegations related to false

14  pricing as opposed to misrepresentations regarding a product's character or quality -- that

15  court appears to have understood *Pearson* to endorse the "purchase price" theory as to

16  some violations of the UTPA but not necessarily as to others.

---

[9]      We note that the certified question appears to assume that a representation about a product's price, comparative price, or price history is *not* a representation about a characteristic of the product itself.  We have never considered that question.  However, because it has no bearing on the conclusions that we reach here, we -- like the Ninth Circuit -- assume for purposes of this opinion that a representation about a product's former price is not a representation about "the character or quality of the product itself."

1    In our view, it was appropriate to accept the Ninth Circuit's certified

2  question to address two issues:  (1) whether this court has in fact previously recognized a

3  purchase price theory for any purpose; and (2) whether, regardless of the outcome of that

4  inquiry, it is a viable theory for purposes of the alleged UTPA violations in plaintiff's

5  case.  Because, however, it is not necessary to decide the viability of plaintiff's other

6  theories of loss to address those purposes for which we accepted certification, we

7  respectfully decline the Ninth Circuit's invitation to broaden our inquiry to consider the

8  viability of those other theories.  Thus, we proceed to consider whether, under *Pearson* or

9  otherwise, plaintiff's reliance on a purchase price theory to establish ascertainable loss is

10  viable under the UTPA.[10]

11  C.    *Our Focus on "Ascertainable Loss"*

12    We begin with a general observation regarding the UTPA:  An individual

13  consumer's ability to pursue a private right of action typically does not depend on which

14  particular UTPA violation the complaint alleges.  That is, the UTPA does not limit

15  private rights of actions to specific unfair trade practices, whether involving a false

16  representation as to a product's character or quality or, indeed, *any* false representation.

17  Rather, under the plain terms of ORS 646.368(1),[11] if a person can prove an ascertainable

---

[10]    We express no view whether plaintiff's other proffered theories of
ascertainable loss are viable under Oregon law.

[11]    ORS 646.638(1) provides, in part:

"[With certain exceptions not relevant here,] a person that suffers an

1    loss resulting from any unfair trade practice identified in ORS 646.608, she may pursue a

2    private right of action.[12]  Thus, the proper focus here is on whether the complaint alleges

3    an ascertainable loss, and not on whether it alleges a particular form of misrepresentation.

4              Here, therefore, plaintiff only was required to allege that, as a result of any

5    practice prohibited under the UTPA, she suffered an ascertainable loss -- that is, a loss

6    capable of being observed or determined, however small.[13]  *Pearson*, 358 Or at 117

---

ascertainable loss of money or property, real or personal, as a result of
another person's willful use or employment of a method, act or practice
declared unlawful under ORS 646.608, may bring an individual action in an
appropriate court to recover actual damages or statutory damages of $200,
whichever is greater."

[12]     Notably, in addition to prohibiting misrepresentations about a product's
"characteristics, ingredients, uses, benefits, quantities or qualities," ORS 646.608(1)(e)
also prohibits merchants from representing that goods have sponsorships or approvals
that they do not have; ORS 646.608(1)(d) prohibits merchants from misrepresenting the
geographic origin of a product; and, as pertinent here, ORS 646.608(1)(j) prohibits
making "false or misleading representations of fact concerning the reasons for, existence
of, or amounts of price reduction.  Other provisions involve representations that have
nothing whatsoever to do with a product, such as ORS 646.608(1)(q), which prohibits
misrepresentations as to how long it will take to deliver a good, and still others do not
involve misrepresentations at all, such as ORS 646.608(1)(n), which prohibits soliciting
potential customers telephonically or door-to-door without providing certain information,
and ORS 646.608(1)(r), which prohibits inducing or attempting to induce membership in
a pyramid club.

[13]     As the Ninth Circuit recognized, nothing in this court's decision in *Pearson*
suggests otherwise.  The plaintiffs in *Pearson* alleged that Philip Morris had committed
an unlawful trade practice under ORS 646.608(1)(e), which, as noted, prohibits false
representations regarding the "sponsorship, approval, characteristics, ingredients, uses,
benefits, quantities or qualities" of goods.  In that case, the plaintiffs allege that Philip
Morris had violated that provision by falsely representing that its "Marlboro Light"
cigarettes would deliver less tar and nicotine than regular "Marlboro" cigarettes did.  That
is, unlike this case, the action in *Pearson* involved a provision that, at least as applicable

1    (ascertainable loss is loss "capable of being discovered, observed, or established," and

2    "objectively verifiable"); *Weigel*, 298 Or at 136-37 (ascertainable loss is "any

3    determinable loss," including loss that cannot be measured exactly; loss may be "so small

4    that the common law likely would reject it as grounds for relief").  We turn to whether

5    plaintiff's purchase price theory of loss is an "ascertainable loss" under Oregon law.

6    D.    *The Viability of Plaintiff's Purchase Price Theory.*

7              As discussed above, the UTPA defines a host of unlawful trade practices,

8    which may cause ascertainable losses in myriad ways.  Ascertainable loss, in turn, can be

9    established in various ways.  The question before the court is whether plaintiff's purchase

10   price theory is a viable means of establishing ascertainable loss under the UTPA.  For the

11   reasons that follow, we conclude that it is a viable theory of loss.

12             We begin with plaintiff's assertion that, in *Pearson*, this court recognized

13   the viability of the purchase price theory.  Because the validity of the purchase price

14   theory of loss was not directly at issue in *Pearson*, a discussion of that case will place the

15   court's statements regarding ascertainable loss in context and help explain their

16   significance here.

---

in that case, necessarily required the plaintiffs to allege a misrepresentation concerning a
product's character or quality.  Thus, in that case, we had no reason to discuss the
pleading requirements for a UTPA claim based on false price comparisons, nor did we
suggest that such a claim would require an allegation based on "[s]ome misstatement as
to a characteristic, quality, or feature of the product," as the district court held.  *Clark I*,
2021 WL 1222521 at *6.

1      In *Pearson*, the plaintiffs were two individuals who brought a putative class

2   action alleging that Philip Morris had committed an unlawful trade practice under ORS

3   646.608(1)(e), which prohibits, among other things, representations that goods have

4   characteristics, benefits, or qualities that they do not have.  The plaintiffs alleged that

5   Philip Morris had violated that provision by falsely representing that its "Marlboro Light"

6   cigarettes would deliver less tar and nicotine than its regular "Marlboro" cigarettes.  The

7   principal issue before the court in that case was whether the plaintiffs had "carried their

8   burden to show that * * * evidence common to the class will generate common answers

9   for the individual members" -- in other words, whether common issues predominated

10  and, consequently, whether it was appropriate to certify the class.  *Pearson*, 358 Or at

11  115.  On that point, the court noted that the dispute between the parties centered on two

12  elements of the plaintiffs' UTPA claim:  proof of ascertainable loss and causation related

13  to that loss.

14      The plaintiffs in *Pearson* had proffered two distinct theories of

15  ascertainable loss:  (1) they argued that they and the putative class members had

16  purchased a product that was worth less than they had paid for it and that their damages

17  arose from that "diminished value" -- that is, the ascertainable loss was the difference

18  between the value of the product as advertised and the value of the product that they

19  received; and (2) they  argued that they and other class members had purchased Marlboro

20  Light cigarettes with the belief that they would deliver less tar and nicotine than regular

21  Marlboros, and that they had not received what they had been deceptively led to believe

22  they were buying.  Under that theory, their damages would be measured by the amount

1    that they had each paid for the defendant's product -- that is, they argued that they were

2    entitled to a full refund of the "purchase price."

3            With respect to the plaintiffs' "diminished value" theory of loss, the court

4    observed that the undisputed evidence established that there was not (nor had there ever

5    been) a price differential between Marlboro Lights and regular Marlboros.  As a result,

6    the plaintiffs had not paid more for cigarettes that purportedly would deliver less tar and

7    nicotine than they would have paid for cigarettes without that feature.  Thus, there was no

8    "diminished value" to speak of.  *Pearson*, 358 Or at 124 (observing that "plaintiffs' theory

9    of diminished value provides no logically viable theory on which classwide economic

10   losses can be established").  The court therefore rejected the viability of the plaintiffs'

11   diminished value theory of loss under the specific facts of that case, which in turn

12   rendered it unnecessary to explore whether common issues predominated as to that

13   theory.

14           However, upon turning to the plaintiffs' purchase price theory, the court

15   reversed its approach, first focusing on whether common issues predominated.  The court

16   explained that a key issue in making that determination was whether, to prevail on their

17   class claim, the plaintiffs would have to prove "reliance" -- that is, whether the plaintiffs

18   would have to prove that Philip Morris's misrepresentation had been a substantial factor

19   in each class member's decision to purchase Marlboro Lights.  *Id*. at 125-26.  The court

20   noted that ORS 646.638(1) (providing for a private right of action) does not expressly

21   require reliance, but it does require that a person pursuing a private action under the

22   UTPA demonstrate "an ascertainable loss * * * as a result of" an unlawful trade practice.

1  In other words, the statute requires a plaintiff to show that the unlawful trade practice

2  "caused" the ascertainable loss. *Id*. However, the court stated, "[w]hether reliance is

3  required to establish causation turns on the nature of the unlawful trade practice and the

4  ascertainable loss alleged." *Id*. at 126. And as to the case before it, where the alleged

5  unlawful trade practice happened to be a misrepresentation regarding a product's features,

6  the court held,

7      "[c]ausation is logically established if a purchaser shows that, without the
8      misrepresentation, the purchaser would not have bought the product and
9      thus should be entitled to a refund. * * * As a function of logic, not
10     statutory text, when the claimed loss is the purchase price, and when that
11     loss must be 'as a result of' a misrepresentation, reliance is what 'connects
12     the dots' to provide the key causal link between the misrepresentation and
13     the loss."

14  *Id*. In rejecting the plaintiffs' argument that, under the circumstances of the case, they did

15  not have to establish reliance on the part of all class members, the court stated:

16     "It is not the nature of the misrepresentation in this case that requires proof
17     of reliance. It is the misrepresentation coupled with plaintiffs' theory for
18     having suffered a loss in the form of the purchase price because they did
19     not get what they believed they were buying."

20  *Id*. at 127. Ultimately, the court determined that the plaintiffs had failed to show that

21  they could litigate the issue of reliance -- as relevant to their purchase price theory --

22  through common evidence rather than through the testimony of the individual class

23  members; they therefore had not carried their burden to show that, as to that element of

24  their case, common issues predominated over individual ones. *Id*. at 135-36.

25          Notably, unlike its decision regarding the plaintiffs' diminished value

26  theory, the court did not expressly determine whether the plaintiffs' purchase price theory

1   could be viable under the facts of that case. However, the court presumed that it was

2   valid for purposes of analyzing the classwide reliance issue. *See id*. at 126 (explaining

3   requirement of proving individual causation when the theory of loss is that "the purchaser

4   would not have bought the product and thus should be entitled to a refund," *i.e.*, "when

5   the claimed loss is the purchase price"); *id*. at 127 (explaining that a showing of reliance

6   was essential given the "plaintiffs' theory for having suffered a loss in the form of the

7   purchase price because they did not get what they believed they were buying").

8           And, in her concurring opinion in *Pearson*, Justice Walters elaborated on

9   why, in her view, a purchase price theory of loss -- one in which there is no indication

10   that a product's objective "value" is less than the product's represented value -- should be

11   cognizable under the UTPA. Relying on this court's decision in *Weigel*, Justice Walters

12   explained that, because the UTPA was designed to encourage private enforcement of the

13   law's standards, a party's losses should be viewed broadly. For that reason, she

14   explained:

15        "[P]rivate claims under the [UTPA] are not limited to those where a
16        plaintiff shows 'an economic loss in the sense of a difference between the
17        price paid and some objective measure of market value.' The act also
18        permits a claim when a plaintiff can establish a loss based on the fact he or
19        she expended funds 'for goods that are not as desired by the customer and
20        represented by the seller irrespective of their market value to others.'"

21   *Pearson*, 358 Or at 142 (Walters, J., concurring) (quoting *Weigel*, 298 Or at 133, 134

22   (citations omitted)). Further, Justice Walters stated, a plaintiff "who can show that he or

23   she would not have purchased a product but for the seller's misrepresentations about that

24   product[] may seek return of the money paid for the product irrespective of its market

1    value." *Id*. at 142-43.

2           As the foregoing suggests, the court in *Weigel* had earlier suggested that it

3    might be possible to prove an ascertainable loss with evidence that the product was not

4    what was bargained for, even if the plaintiff could not establish that the product's value

5    was less than the seller had represented.  In *Weigel*, the court agreed that a showing of

6    diminished value was one way to prove ascertainable loss under the UTPA, but the court

7    observed that it was not necessarily the only way to make that showing.  The court

8    posited that, in requiring proof of an ascertainable loss, the legislature may well have

9    intended only to "exclude a civil action by a customer who was attracted by a forbidden

10   misrepresentation but in fact did not act upon it, or who received immediate satisfaction

11   at no expense when bringing the matter to the seller's attention."  298 Or at 134.  In the

12   court's view, that understanding of the statute was plausible, given that the UTPA

13   authorized both public and private enforcement, and, at least as to public enforcement,

14   did not require proof that any particular person had suffered an economic loss.  The court

15   noted:

16           "The civil action authorized by ORS 646.638 is designed to encourage
17           private enforcement of the prescribed standards of trade and commerce in
18           aid of the act's public policies as much as to provide relief to the injured
19           party.  This is apparent from the section itself.  It allows recovery of actual
20           damages or $200, whichever is greater, plus punitive damages, costs, and
21           attorney fees."

22   *Weigel*, 298 Or at 134-35 (footnote omitted).  The court in *Weigel* then quoted with

23   approval the Connecticut Supreme Court's interpretation of the phrase "ascertainable

24   loss" in that state's own law:

19

1   "'Whenever a consumer has received something other than what he
2   bargained for, he has suffered a loss of money or property.  That loss is
3   ascertainable if it is measurable even though the precise amount of the loss
4   is not known.  * * * In one sense the buyer has lost the purchase price of
5   the item because he parted with his money reasonably expecting to receive
6   a particular item or service.  * * * In another sense he has lost the benefits
7   of the product which he was led to believe he had purchased.  That the loss
8   does not consist of a diminution in value is immaterial[.]'"

9   *Id.* at 136-37 (quoting *Hinchliffe v. American Motors Corp.*, 184 Conn 607, 614, 440 A2d

10  810, 814 (1981)).  Thus, the court in *Weigel* agreed that, in at least some instances,

11  ascertainable loss might well be established by proof that a consumer would not have

12  purchased the product but for a seller's misrepresentation; in such cases, the plaintiff's

13  loss would be measured by the purchase price of the item.

14  We recognize that, as in *Pearson*, the *Weigel* court's discussion of the

15  purchase price theory was not the holding of that case.  As we observed, the record in that

16  case supported a finding of reduced value -- it therefore was unnecessary to conclusively

17  decide whether a purchase price theory of loss would be viable.  *Id*. at 137 ("Scrutiny of

18  the record reveals that the present case also does not turn on the question whether any

19  objective loss in market value is required.").  Here, however, we must decide whether

20  that theory is viable under the UTPA.  For much the same reason that we stated in *Weigel*

21  -- and Justice Walters articulated in her concurrence in *Pearson* -- we conclude that the

22  purchase price theory is a viable means of establishing ascertainable loss as required

23  under ORS 646.638 and is, therefore, a cognizable theory of loss in plaintiff's case.

24  At its essence, the purchase price theory is that one person has been

25  induced by another person's unlawful activities to pay money for something that the first

1    person would not otherwise have bought.  In plaintiff's case, what she wanted was items

2    of clothing whose selling price had, at some earlier time, been what defendants' false

3    price listings indicated.  What she received, on the other hand, was merchandise that had

4    never been offered for sale at those prices.  Thus, whether or not those items ever *sold* at

5    those higher price points, and whether or not defendants' alleged pricing scheme can be

6    viewed as representing that the items previously had retail or market values equivalent to

7    the prices shown on their product tags, plaintiff paid money to defendants for articles of

8    clothing that she would not have bought had she known their true price history.  The

9    money that plaintiff is out as a result is her "loss."

10           Nothing in the UTPA ties the notion of "ascertainable loss" to proof that a

11   person received something of lesser "value" than the person paid.  As the Connecticut

12   Supreme Court observed in discussing that state's statute, it should not matter that a

13   person unlawfully led to believe that she was buying one thing ultimately received

14   another thing of equal or even greater value.  *Hinchliffe*, 184 Conn at 614, 440 A2d at

15   814 ("To the consumer who wishes to purchase an energy saving subcompact, for

16   example, it is no answer to say that he should be satisfied with a more valuable gas

17   guzzler.").

18           To hold that there is no ascertainable loss under those circumstances would

19   suggest one of two things:  either (1) the legislature, despite rendering this very practice

20   unlawful and authorizing private citizens to enforce the UTPA, intended for a person in

21   plaintiff's shoes to be left without recourse under the UTPA; or (2) the parties'

22   transactions took place in a perfectly efficient economy, one in which a person deceived

1  into buying an unwanted product could, entirely without financial or personal cost, resell

2  the item for exactly the price that she had paid for it.

3        Neither view is tenable.  The first understanding, as the *Weigel* court and

4  Justice Walters have explained, is inconsistent with the objectives of the UTPA, which

5  are themselves indicated by the legislature's empowerment of private citizens to enforce

6  its provisions -- including the ones at issue in this case -- and its allowance of nominal

7  damages where substantial loss cannot be shown.  And the latter ignores reality.  We

8  decline to attribute either rationale to the legislature, which would be necessary to hold

9  that a person does not suffer an ascertainable loss so long as she receives something of

10 equal or greater value than the money she was deceived into giving up for it.

11       In resisting that conclusion, defendants observe that, when, as in *Pearson* or

12 the *Hinchliffe* hypothetical, a seller misrepresents a product's characteristics or quality,

13 there necessarily is a difference in value between the product as advertised and the

14 product as it really is.  In contrast, they reason, when, as here, the misrepresentation

15 concerns a product's price history, the represented value of the product at the time of sale

16 is in fact the product's exact value.  Thus, in defendants' view, the only harm that plaintiff

17 has suffered is "subjective disappointment" that she failed to obtain the bargain that she

18 believed she was getting, which defendants contend is not compensable as economic

19 injury under the UTPA.

20       Defendants' distinction is misplaced.  To the extent that *Pearson* addressed

21 the issue, the court expressly recognized that there was *not* necessarily a difference in

22 value whenever a product's characteristics differed from those that the seller had

1 advertised.  As explained above, the plaintiffs in *Pearson* had argued that, because there

2 was a difference between the advertised product -- cigarettes that were "light," delivering

3 less tar and nicotine -- and the product that they actually received -- cigarettes that were

4 not "light" when smoked normally -- the product that they bought necessarily had a lesser

5 value than the product they thought they were buying, and they were therefore entitled to

6 damages in the amount of that difference.  The court rejected that argument because

7 Marlboro Lights were and always had been sold by Philip Morris at the same price as

8 regular Marlboros.  Thus, the distinction that defendant would make, between a seller

9 who misrepresents a product's physical characteristics or quality and a seller who

10 mispresents the product's price history, is not supported by our case law.

11       Defendants also point to several cases from other jurisdictions in which

12 courts have rejected the purchase price theory, reasoning that, in arguing that a purchase

13 of an item in reliance on a misrepresentation constitutes a loss of the purchase price, the

14 plaintiffs were "conflat[ing] the deceptive act with the injury."  *Naimi v. Starbucks Corp.*,

15 798 Fed Appx 67, 70 (9th Cir 2019) (memorandum opinion); *see also Shaulis v.*

16 *Nordstrom, Inc.*, 865 F3d 1, 11 (1st Cir 2017) (construing Massachusetts law; concluding

17 that viewing "mere purchase" as cognizable injury "merges the alleged deception with the

18 injury"); *Small v. Lorillard Tobacco Co.*, 94 NY2d 43, 56, 720 NE2d 892, 898 (1999) (no

19 injury alleged under New York law where the complaint "sets forth deception as both act

20 and injury").

21       We disagree with the rationale expressed by those courts.  In *Shaulis*, the

22 only one of the above opinions to substantively explore the issue, the First Circuit

1   considered whether, under the Massachusetts "Consumer Protection Act" (Chapter 93A),

2   an allegation that the plaintiff had been "'induced' to make a purchase that she would not

3   have made, but for" the defendant's pricing scheme was sufficient to state a claim.  865

4   F3d at 10.  Similarly -- but not identically -- to ORS 646.638(1), Chapter 93A provides a

5   private cause of action to a person "who has been injured by another person's use or

6   employment of any method, act or practice declared to be unlawful" under that act.  Mass

7   Gen Laws ch 93A, § 9(1); *see also id*. § 2(a) (prohibiting "unfair or deceptive acts or

8   practices in the conduct of any trade or commerce").  Citing its own decision in an earlier

9   case, the First Circuit observed that recent decisions of the Massachusetts Supreme

10   Judicial Court "had 'moved away' from the 'per se' theory of injury supported by earlier

11   cases -- that is, a claim that an unfair or deceptive act alone constitutes injury -- and had

12   'returned to the notion that injury under [C]hapter 93A means economic injury in the

13   traditional sense.'"  *Shaulis*, 865 F3d at 7 (quoting *Rule v. Fort Dodge Animal Health,

14   Inc.*, 607 F3d 250, 254-55 (1st Cir 2010) (brackets in *Shaulis*)).

15         That development, the First Circuit concluded, required it to reject the

16   plaintiff's theory that she had been injured in the amount of the purchase price when she

17   bought a sweater from the defendant's outlet store that sold for $49.97 but displayed a

18   much higher "Compare At" price of $218.00 on the same tag.  *Id.* at 4.  Notably,

19   however, none of the Massachusetts decisions that the First Circuit identified as

20   exhibiting that recent trend involved an alleged "injury" comparable to that alleged by the

21   plaintiff before it or, significantly, plaintiff in this case.  Rather, those cases involved true

22   "violation as injury" scenarios, one asserting that a retailer had unlawfully written

1  customers' personal identification information on credit card transaction forms -- but had

2  not used or mishandled that information in any way -- and another raising a utility

3  company's "fail[ure] to comply with certain storm preparedness regulations," when no

4  storm had occurred in the relevant time frame.  *Id*. at 8-9.  As the First Circuit understood

5  those decisions, they rejected the plaintiffs' claims as premised on alleged injuries that

6  were "merely hypothetical or speculative."  *Id*. at 9 (explaining that decisions treated

7  plaintiffs' theories as "akin to a per se theory of injury," alleging "only a *possibility* of

8  adverse consequences -- which did not occur").

9          In applying that understanding to the plaintiff's "induced purchase" theory,

10  the *Shaulis* court never meaningfully engaged her argument that the cognizable injury she

11  had suffered was the loss of money that she would have retained if the defendant had not

12  unlawfully deceived her.[14]  Instead, the court first identified a scenario in which a retailer

13  engages in the same "Compare At" pricing scheme but fails to make a sale, and then

14  observed that the plaintiff had not alleged that the sweater was poorly made or that its

15  materials had been misrepresented.  *Id.* at 11 (stating that the plaintiff identified "no

16  objective injury traceable to the purchased item itself").  True, the first scenario *would* be

17  a violation-as-injury case, but that was not the case before that court, nor does it reflect

18  the facts of this case.  And although the plaintiff's failure to allege that the product she

---

[14]      As we understand the arguments in *Shaulis*, the plaintiff's "induced purchase" theory, including the alleged injury measured by the item's actual sale price, is indistinguishable from plaintiff's "purchase price" theory in this case.

25

1  purchased was in some way defective may have meant that she had not made out a

2  different theory of "injury," it fails to illustrate how the plaintiff's "induced purchase"

3  theory merged the deceptive act with the alleged injury -- her expenditure of money.

4  More to the point, the First Circuit's observation that the plaintiff had not identified any

5  "injury traceable to the purchased item" appears misplaced:  Under Chapter 93A -- much

6  like under ORS 646.368(1) -- the injury must be "traceable" to the *violation*, and not to

7  the item deceptively marketed.  Mass Gen Laws ch 93A, § 9(1) (providing cause of

8  action to a person "who has been injured *by another person's use or employment of any*

9  *method, act or practice declared to be unlawful*" under the act (emphasis added)).

10        Thus, insofar as plaintiff's purchase price theory in this case might fail

11  under *Shaulis* and similar cases, we reject the underlying rationale that it somehow

12  "merges" the alleged violation with the asserted loss.  As the court acknowledged in

13  *Weigel*, individuals who were "attracted by a forbidden misrepresentation but in fact did

14  not act upon it, or who received immediate satisfaction at no expense when bringing the

15  matter to the seller's attention," will have been subjected to deception, but they will not

16  have suffered injury as a result.  *Weigel*, 298 Or at 134.  However, when a person acts in

17  response to the deception by spending money that the person would not otherwise have

18  spent, the person has been injured to the extent of the purchase price as a result of that

19  deception.  That is, there has been both a violation -- the seller's misrepresentation as to

20  the item's price history -- *and* a resulting ascertainable loss -- the expenditure of the

21  purchase price.  That is what ORS 656.638(1) requires.

22        To summarize, although neither *Pearson* nor *Weigel* held that the purchase

26

1  price theory was a valid means of establishing ascertainable loss under the UTPA, neither

2  forecloses such a theory, either, as the federal district court evidently believed.

3  Moreover, both *Weigel* and Justice Walters's concurrence in *Pearson* express sound

4  reasoning that, in our view, supports its recognition here.  For much the same reasoning

5  as that expressed in those opinions, we conclude that, if plaintiff can prove that she would

6  not have purchased defendants' garments had defendants not misrepresented their price

7  history, plaintiff will satisfy the "ascertainable loss" requirement under the UTPA.

8                                    III.  CONCLUSION

9            In answer to the question propounded to us by the Ninth Circuit, we hold

10  that, an "ascertainable loss" within the meaning of the UTPA can, under some

11  circumstances, flow from a consumer's decision to purchase a product in reliance upon

12  the retailer's misrepresentation as to price history or comparative prices.  Thus, plaintiff's

13  purchase price theory is a viable theory of ascertainable loss even in the absence of a

14  showing that the seller misrepresented some characteristic or quality of the product sold.

15            The certified question is answered.